(33 South. 926.)

No. 14,316.

RUCKS v. MINDEN LUMBER CO.*

(June 21, 1902.)

INJURY TO EMPLOYÉ—CONTRIBUTORY NEGLI-GENCE—FELLOW SERVANTS.

1. Personal injury case, determined on facts. Judgment of district court in favor of plaintiff reversed, and his demand rejected.

(Syllabus by the Court.)

Appeal from Judicial District Court, parish of Webster; John Thomas Watkins, Judge.

Action by Henry Clay Rucks, as guardian, against the Minden Lumber Company. Judg-

*Rehearing denied March 16, 1903.

ment for plaintiff, and defendant appeals. Reversed.

Purnell Mitchell Milner and Lynn Kyle Watkins, for appellant. Stewart & Stewart and Holbert & Barrett, for appellee.

NICHOLLS, C. J. The defendant has appealed from a judgment against it for $3,-000 as damages for injuries received by plaintiff while employed as an off-bearer in defendant's sawmill.

The case was tried before a jury, and its verdict approved by the court on application for a new trial.

Plaintiff's allegations as to the accident and its cause were as follows:

That on July 2, 1901, while in the employ of said Minden Lumber Company, and while performing his duties at their mill in Minden, in the capacity of off-bearer, in front of the saw, and alongside of the log carriage, a large piece of timber, 8x10 inches square and 14 feet long, came from the saw, and while it was being shoved or kicked on the live rollers, to be carried off, the sawyer or carriage runner negligently allowed the carriage to rush violently back towards the saw, hurling said piece of timber against the said William Howard Rucks, driving the broken bones through the flesh, bruising his hip and thigh, injuring him in the small of the back, mashing and lacerating his hand and arm, and painfully injuring him in many other ways. That he suffered long and excruciating pains from said injuries. That he was confined to his bed for about three months, and has not been able to do any work, and will not be for a long period. That he will be a cripple all of his life, and is permanently injured and damaged.

That said accident happened and said injury and damage was caused to the said William Howard Rucks by the fault and gross negligence and carelessness of the Minden Lumber Company, its agents and employés. That the sawyer or carriage runner was incompetent, unskilled, and ignorant of his duties, negligent and unfit to handle the saw, and, by his negligence, want of skill, and incompetency when they employed him, caused said injury. That the defendant well knew his incompetency when they employed him, and were grossly negligent and wanting in

care in placing a new, ignorant, and unskilled hand in charge of the saw, and that by this fault, negligence, and want of care they have caused the said William Howard Rucks damage in the sum of $15,000.

Defendant pleaded the general issue. It specially denied that it was guilty of negligence, and averred that plaintiff's son was injured by his own gross negligence, or, if injured by the negligence of a fellow servant, that he assumed the risk of his employment, respondent being free from all negligence. We have examined the evidence in the record with care, and we are of the opinion that the verdict and judgment cannot be sustained.

Plaintiff's allegations to the effect that "the sawyer or carrier runner at the time of the injury was incompetent, unskilled, and ignorant of his duties, negligent and unfit to handle the saw, and, by his negligence, want of skill and incompetency when they employed him, caused said injury, and that the defendant well knew his incompetency when they employed him, and were grossly negligent and wanting in care in placing a new, ignorant, and unskilled man in charge of the saw, and that by this fault, negligence, and want of care they have caused the said William Howard Rucks damage," are affirmatively disproved.

This theory was doubtless based upon the fact that the sawyer (Baker) had been at this saw only a short time before the accident occurred, and had been for that purpose taken from the employment which he had hitherto had, as "block setter"; but it is shown that Lindsey, the regular sawyer, had left only a short time previously, and that the block setter is generally a man who has had experience as a sawyer, and generally replaces the regular sawyer temporarily, when the latter is called off for any purpose. Baker is shown to be an experienced sawyer, and we see nothing in his conduct on this particular occasion by reason of which he could be charged either with incompetency or negligence. We think he did everything that it was possible to have done under the circumstances, and that he acted with promptness in endeavoring to save the situation. We are of the opinion that, so far from contributing to or being the occasion of the injury to young Rucks, the latter would have

been killed, had not it been for Baker's reversing the carriage as quickly as he did. His own life depended upon his quickness. In his testimony he says that he saw Rucks as he placed his hands upon the piece of moving timber which caused his injuries when it struck him, and, seeing and knowing at once what the consequences would be of his touching it, he acted instantly trying to avert the accident, but doing so with only partial success. His statement as to his own conduct and as to the cause of the accident is fully corroborated. If Baker was not at fault, the accident was occasioned either through the fault of Rucks himself, or that of one or the other of the two "doggers," who were fellow servants and co-workers with him at the carriage. We do not think it important, under such circumstances, to ascertain—as affecting legal results—whether the injury was due to Rucks' fault, or to that of one of the two men opposite the carriage, for, whether one or the other, defendant would not be responsible. We may say here that the term "dogger" is given to men who stand opposite the log as it is being sawed up, and kick off with their feet, and onto the rollers, slabs from the logs as they are cut. We think it due, however, to the doggers, to say that, in our opinion, under the evidence, Rucks himself was the cause of his own injuries. We believe him to be absolutely sincere in his testimony, but things occurred almost in the twinkling of an eye, in the midst of rapidly moving machinery, and the party so terribly injured was less apt to understand and appreciate the exact situation than others, not directly concerned, who were looking on. Rucks himself, as well as his witnesses, says he put his hands upon the moving piece of timber. They differ only as to the precise time and circumstances under which he did this. Two of plaintiff's witnesses (the two Slaytons) were idle spectators, totally unfamiliar with sawmill operations, and we do not attach any very great weight to their statements as to details, which, besides, are not very clearly given.

The following is Baker's account of the occurrence:

"This was some time in the evening, when he got hurt—somewhere about three o'clock. Mr. Rucks had been working all that day,

and I noticed that he would let a piece slip and fall down between the live-roller casing and the carriage every once in a while, and I noticed that he seemed to be a very careless man, and I kept my eye on him. We had a piece of 10 by 10, 14 feet long, on the two back blocks, because it wouldn't reach the third block. We never saw 14-feet pieces on the third. We had sawed this piece up, and was ready to throw it off, and the front man kicked off something like 15 or 16 inches from the block, and the man on the right-hand side of the block setter kicks his end off until we got the log along the rollers, with the end next to the rollers, 4 or 5 inches from the breastplate; and then, when I run that way, I seen Mr. Rucks reach out after it with his hand, and I knew what would happen, so I throwed it over and stopped it. When I seen him pull that timber round that way, and throw the end of it into the front headblock, so it caught with the front block and threw it back onto him. Just as he reached after the timber I threw the carriage over, and run it back to the other bumper. The steam was on the carriage, and threw it against him when the bumper struck it.

"Q. Well, state whether or not the carriage came back with its full force and struck him?

"A. No, sir; if it had, it would have cut his leg slap off.

"Q. In the operation of the mill, does that carriage work with much rapidity?

"A. It is pretty quick.

"Q. Well, is it necessary, in the operation of the mill, to work that carriage quickly?

"A. It is natural for the sawyer to get it back as quick as possible when it is empty.

"Q. It is a part of your duty?

"A. Yes, sir.

"Q. What was the name of the dogger that kicked the timber off?

"A. Both of the doggers kicked the timber clear of the carriage.

"Q. Who was on the west side?

"A. Smith Johnson.

"Q. Who was on the east end?

"A. Steven Pearce.

"Q. Who was in the middle?

"A. The setter, Walter Pilsberry.

"Q. Is he white?

"A. Yes, sir.

"Q. What are the other two?

"A. They are darkeys.

"Q. What was the length of time between the moment you saw Rucks put out his hand toward this log and the time you put on your lever?

"A. When I saw the timber clear of the carriage I pulled the carriage open and give it all the steam, and as I pulled it over this way I was watching this man like that. He was about as far as that man over there. I would judge, about 7 feet from me. And when I pulled this lever over this way I was watching him, and when I saw him go after the end of the timber next to him I knew what it would do if he ever got his hand onto it, and tried to stop it before the timber struck him.

"Q. Did Rucks get his hand on the timber?

"A. Yes, sir. The timber was clear, and, if he had kept his hands off of it, it would never have struck him. He is the man that pulled the timber onto the carriage.

"Q. Is it your duty to watch and see that the carriage is clear of the timber?

"A. It certainly is, because I have my own life in my hands, and that of five other men.

"Q. Was there any reason for Rucks grasping that piece of timber?

"A. None whatever—only carelessness.

"Q. Whose duty is it to get the timber onto the live rollers?

"A. It is the doggers'.

"Q. Has the off-bearing man anything to do with that?

"A. Nothing whatever.

"Q. Was he doing the wrong thing, or the right thing, in putting his hand on that timber?

"A. He was clear out of his place, I would call it.

"Q. That was a large timber?

"A. It was a 10x10, 14 feet.

"Q. Which hand did he put on it?

"A. His right hand.

"Q. Do you not know that it is impossible for that boy, with his right hand, to pull that piece of timber, 10x10—that he can't pitch with both hands?

"A. I know that, if he ever puts his hand on it the least bit, he can turn it. I can turn it with those two fingers.

"Q. You was looking at him?

"A. Yes, sir; just like I am looking at you.

"Q. You saw him, and was looking at the timber?

"A. When I saw him put out his hand, I saw what was going to be done.

"Q. Why did you not stop the carriage at that moment?

"A. I reversed it as quick as I could.

"Q. When you saw him lay his hand on the timber, you reversed it?

"A. Yes, sir.

"Q. Yet it got far enough down to strike him and break his leg?

"A. Yes, sir.

"Q. He pulled the timber in?

"A. Yes, sir; and in the slide of the carriage the end of the timber is what struck him and broke his leg; otherwise it would have cut his leg off.

"Q. Did you say the carriage can slide?

"A. Yes, sir.

"Q. Does it not run on wheels, and not cogs?

"A. Yes, sir. It does, but when you get on steam, and reverse it that way, it is going to slide a certain distance before the steam has power to take hold of it and move it the other way.

"Q. How far did he pull that log?

"A. About twenty or twenty-four inches."

In this statement he is corroborated by the testimony of the two doggers, Smith Johnson and Steven Pearce.

We give much weight to the testimony of W. T. Rich, from which we make the following extract:

"Q. What position have you with the Minden Lumber Company?

"A. I run the trimmer saws. Run the trimmer.

"Q. What position had you last July, when this young man got hurt?

"A. Running the trimmer saws.

"Q. Where were you, in reference to the place where he got hurt?

"A. I suppose I was about 150 feet right up the live rollers—about 4 feet above the live rollers.

"Q. You are in an elevated place?

"A. Yes, sir; about 3 or 4 feet above the rollers, I reckon, and about 150 or 200 feet right straight up the rollers.

"Q. What was your opportunity for seeing down where he was at?

"A. Perfectly good, sir.

"Q. What part of it did you see?

"A. I saw the timber when it struck Mr. Rucks, and saw them when they kicked it off, and saw him when he pulled the end of it around.

"Q. Do you know what became of the carriage, then—whether it went on, or whether it was reversed?

"A. It was reversed.

"Q. Is there not a lot of edging machines, trimmers, and various machines between you and where this boy was?

"A. None at all between me and where the boy was. I was above all of them—nearly right over the rollers that runs to the left of the edgers that you were calling the 'trimming machine,' I reckon.

"Q. What was the position of that stick when he laid his hand on it?

"A. That stick of timber was laying crossways on the rollers, to some extent. Just to what degree, I can't say. It was laying crossways on the rollers, the front end of it pointing out north, diagonally across the rollers.

"Q. You saw him put his hand on it?

"A. I did.

"Q. If that hand had not been put on there, that piece of timber would have gone on its way, would it not?

"A. Yes, sir.

"Q. Then there was no need of his putting his hand on it?

"A. No, sir; I couldn't say positively as to that. The timber was crossways on the rollers, and might have needed a little straightening.

"Q. On those rollers it would have gotten straight, would it not?

"A. No, sir; unless somebody had straightened it as it went out on the rollers. * * *

"Q. You can't give any reason, with that timber lying that way on the rollers, why he wanted to put his hand on it and pull it?

"A. No need on earth, unless he just wanted to put his hand on it and straighten it so it would go out of the mill straight. That is all I can give.

"Q. How long had he had his hand on it before the piece struck him?

"A. It was done very quick. I can't say just how long.

"Q. Well, after that piece of timber was kicked off onto those live rollers to the extent

that you say it was, if Mr. Baker had shot his carriage back it would not have caught the end of it on the end of that timber, would it?

"A. If the timber had not been pulled back against the carriage, it would not; no, sir.

"Q. He delayed running his carriage back until after the boy had pulled the timber back?

"A. I don't know whether he did or not; no, sir.

"Q. What was there to prevent him from seeing that boy put his hand on that piece of timber? Was there anything to prevent it?

"A. I believe he said he saw him.

"Q. What is there to prevent him, when that boy put his hand on that timber and pull the end of it around there, as you say—is there anything to prevent him from seeing it?

"A. Nothing in the world.

"Q. Well, when he saw that, he should have stopped the carriage, shouldn't he?

"A. Well, he did.

"Q. Well, answer the question, and don't argue Mr. Baker's side of it.

"A. Yes, sir; he did.

"Q. Then, if he had done that as soon as the boy put his hand on the stick, there would have been no accident, would there?

"A. The carriage could have gone back some few—

"Q. Well, you are arguing their side of the case. How far would that carriage have to go back before it would have struck that piece of timber—how many feet?

"A. I don't know exactly—several feet.

"Q. Well, if Mr. Baker had been on the alert and done his duty when this end of this piece of timber had gotten way over here—if he had shot his carriage back until that timber had passed that point—the accident would not have happened, would it?

"A. If he had gotten by the end of it, it would not; no, sir.

"Q. How far is it back to the end of that?

"A. It is several feet.

"Q. How many?

"A. I can't say exactly how many—3 or 4 feet, I guess.

"Q. All that was necessary was to get the timber beyond that point?

"A. That is all, sir.

"Q. Is there anything to hinder Mr. Baker from doing that, if he had been on the lookout?

"A. Yes, sir; the boy pulled the timber just about the time Mr. Baker pulled the lever, and they both came together.

"Q. Do you tell this jury that that boy put his hand on that timber, and pulled it back, as heavy as it was, before Baker could pull his carriage three feet back?

"A. Yes, sir; certainly.

"Q. That is an extraordinary statement, to me.

"A. I can't help that, sir."

We feel thoroughly satisfied that the ·verdict of the jury, and the judgment rendered herein, are contrary to the law and the evidence. For the reasons assigned, it is hereby ordered, adjudged, and decreed that the verdict of the jury, and the judgment of the court therein rendered, appealed from, be, and the same are hereby, set aside, annulled, avoided, and reversed; and it is now ordered, adjudged, and decreed that plaintiff's demand be rejected, and his suit dismissed, with costs in both courts.